# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| _In Re_ Application of )<br><br>STICHTING BUREAU FRAUDE RECHT &<br>GELDZAKEN BELANGENBEHARTIGING EN<br>SCHADECLAIMAFWIKKELING<br>GEDUPEERDEN GOODWOOD – ATF EN<br>FLORESTECA )<br><br>_Applicant_ )<br><br>for Judicial Assistance to Obtain Evidence<br>for Use in a Foreign Proceeding Pursuant to<br>28 U.S.C. § 1782 ) | Misc. Case No. _____ |

## APPLICATION FOR JUDICIAL ASSISTANCE TO OBTAIN EVIDENCE FOR USE IN A FOREIGN PROCEEDING

1.　　The Applicant respectfully submits this Application for an order of this Court pursuant to 28 U.S.C. § 1782 to authorize the Applicant to issue subpoenas duces tecum on twelve respondents, ten of which are financial institutions and two of which are entities operating financial clearing and settlement networks, all of which are found or reside in this District. The Applicant intends to use the sought after evidence in a contemplated proceeding on behalf of victims of fraud before the Rechtbank (District Court) in Amsterdam, the Netherlands.

## INTRODUCTION

2.　　The relevant facts to this Application are summarized below and set forth more fully in the Declaration of Dr. Paul Bavelaar LL.M. in Support of the Application for Judicial

Assistance to Obtain Evidence for Use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 (the "Bavelaar Declaration") exhibited hereto. The facts stated in the Bavelaar Declaration are incorporated herein by reference.

3.      The Applicant is Dutch foundation specially formed by the Bureau Fraude Recht & Geldzaken, which is itself a Dutch foundation that represents and advocates for fraud victims generally. Bavelaar Decl. ¶ 7. The Applicant represents approximately 1,200 individual victims of a specific fraud in the Netherlands, Id. ¶ 9, involving purported teakwood investments in Brazil orchestrated by the Floresteca and Goodwood group of companies, the Amazon Teak Foundation ("ATF"), and their promoters, including Henk C. Van Druten; Laurentius P.A. Brouns; Sylvio de Andrade Coutinho; Sylvio de Andrade Coutinho, Jr.; and Rende A. Feitsma, Id. ¶ 3.

4.      The fraud began in 1993, and the promoters' modus operandi, including the investment products offered and entities used, evolved over time. Id. ¶ 10. The fraud was part Ponzi scheme, part purported transfers of land title that did not transfer title and included land that the promoters did not own, part transferring the rights in the same revenue stream to multiple investors, and part self-dealing with the little teakwood that was harvested so that the investors would not realize a return. Id. ¶ 4. Initially in the 1990s, the investment products, including their contracts and terms, were similar; however, by the mid-2000s, investors began "to have 'bespoke' contracts with differing terms, particularly in terms of the expected returns, duration, and purported liens on collateral." Id. ¶ 10. It may have been the case that the promoters "set the terms to whatever was needed in a particular case for victims to part with their money." Id.

5.      At the beginning, the promoters offered two investments; one was a fixed loan product, and the other was a long-term investment whereby specific plots of land for teakwood

trees and harvesting were purportedly transferred to investors. Id. ¶ 12. Due to the twenty to twenty-five-year timeframe from planting to full harvest, the promoters marketed the latter as being an investment for retirement. Id. ¶ 24. In total, approximately 13,600 investors fell victim. Id. ¶ 3.

6.      While the investors in the former investment, i.e., the fixed loan product, were paid in full in the 1990s upon maturity, which generally was five years, almost all of the investors in the latter product (as well as subsequent products the promoters offered) were not paid with the exception of one payment around 2004. Id. ¶ 12. Notwithstanding their representations, the promoters did not transfer the land in terms of the latter investment product. The documents that produced were worth no more than the paper, on which they were printed, because they neither met the formal Brazilian legal requirements to transfer an interest in land nor did the entity that purported to effect the transfer own the land. Id. ¶ 19.

7.      The primary two plantations where the promoters purportedly sold rights to the investors were Buruti, whose rights were created in 1994, Id. ¶ 65, and Paraiso, whose rights were created in 1997, Id. ¶ 21, 66.

8.      Beginning in 1998, the promoters began to offer profit right certificates and participation rights in funds via Goodwood Investments B.V. ("Goodwood") that owned the profit rights via ATF to land that one of the Floresteca companies, Floresteca Agroforestal Ltda., purportedly owned. Id. ¶ 24. Goodwood created and administered the funds that owned the participation rights, and its subsidiary, Goodwood Direct Marketing B.V., marketed the funds to individual investors. Id. Both Goodwood entities were related to the promoters. These funds had guaranteed returns and rights to sell the participation back to the fund. Id. ¶¶ 25, 27. The promoters also offered those investors that purportedly had rights to specific parcels, ¶¶ 6-7, supra, to convert

their investments into participations in these Goodwood funds. Bavelaar Decl. ¶ 25. ATF claims that most investors who had these rights in specific parcel switched to these Goodwood funds. Id.

9.      De Nederlandsche Bank ("DNB"), the Netherlands' current banking regulator and previous central bank before the introduction of the euro, commenced an investigation into Goodwood's fund in 2004. On May 26, 2005, DNB ruled that Goodwood's guaranteed repayment fund was akin to a certificate of deposit, which is a banking product that can only be offered by licensed financial institutions, and Goodwood was not a licensed financial institution. Id. ¶ 27.

10.      DNB issued a civil penalty against Goodwood, which was upheld on appeal on September 6, 2007. Id. ¶ 29.

11.      "Separately, in January 2008, the Netherlands Authority for the Financial Markets ("AFM") suspended Goodwood's license to sell and market securities." Id. ¶ 30.

12.      On February 13, 2008, DNB ordered that Goodwood propose how it would cure its ongoing default of having outstanding investments that it had sold to investors that required a financial institution license. In response, Goodwood sought a waiver from DNB. In analyzing Goodwood's application for a waiver, DNB requested that there be a third party of sufficient financial backing to guarantee the guaranteed repurchases. Goodwood proposed Floresteca B.V. Id. ¶ 31-32.

13.      In January 2009, however, Goodwood advised DNB that it would not be able to honor the guaranteed repurchases because Floresteca B.V. had financial difficulties and would not honor its agreement with Goodwood. Id. ¶ 33.

14.      In February 2009, DNB appointed a receiver over Goodwood. Id. ¶ 34.

15.     In October 2009, Goodwood issued a press release saying that it would start a new fund and existing clients could trade in their guaranteed rights to profit yields for tradable shares in the entire investment. However, this fund never came into fruition. Id. ¶ 35.

16.     Instead, Goodwood petitioned for bankruptcy stating that, in 2008, it had sold its rights to the revenue streams to Floresteca B.V. for €3,200,000, payable in installments over five years. Floresteca B.V. advised in January 2009 that it was having financial difficulties and could no longer make any further payments. ¶ 13, supra. Goodwood, therefore, could no longer honor its repurchase guarantees. The court declared Goodwood bankrupt on December 7, 2010. Bavelaar Decl. ¶ 36.

17.     Notwithstanding DNB's position and investigation, Goodwood sold approximately €100 million of securities during this period while it was under investigation and, thereafter, contesting the civil penalty before the courts. Id. ¶ 37.

18.     During this period up to 2010, Floresteca B.V. approached Goodwood's investors with proposals to exchange their participations in Goodwood for high yielding Floresteca B.V. bonds so long as the investors made an additional cash contribution. The contracts that Floresteca B.V. entered into varied greatly from investor to investor. Generally speaking, however, Floresteca B.V. would purport to value the Goodwood participation at an amount higher than the investor could get in the secondary market. There would be bonuses in the form of bonus principal on the bond and/or waiver of transaction fees. However, all this meant was that the promoters further victimized the investor to the tune of whatever additional cash contribution the investor made. Id. ¶¶ 38-42.

19.     It appears that Floresteca B.V. never had a genuine intention of repaying the bonds that it issued, particularly the shorter duration ones of three to five years, Id. ¶¶ 38, 43, because

based on Floresteca B.V.'s own projected revenue streams, the earliest that Floresteca B.V. would have received any cash flows was 2017. Id. ¶ 43. Moreover, in its bankruptcy, which occurred in 2019, Floresteca B.V. stated that it had intended to repay the bondholders with fresh investment that never materialized, i.e., seemingly a Ponzi scheme. Id. ¶¶ 44-45.

20.     In 2012, facing investor demands and lawsuits, Floresteca B.V. approached investors with proposals, one of which was a five-year moratorium in collection efforts until January 1, 2018, with Floresteca B.V. paying during this period. The investors that the Applicant represents were among those investors that accepted this proposal. Id. ¶ 46-47.

21.     Floresteca B.V. hardly made any communications to the investors during this five-year period, and January 1, 2018, came and went without Floresteca B.V. having made any repayments that it had promised. Id. ¶ 48. Moreover, during this period, Floresteca B.V. sold plantations in Brazil. Id. ¶ 49.

22.     In fact, during this period, Floresteca B.V. destroyed collateral. Regarding the Buruti rights created in 1994 with a contractual felling in 2019, satellite images show the trees there in 2015 but not after early 2016. Id. ¶ 65. In respect of the Paraiso rights created in 1997, the trees had been planted but satellite images show that the plantation was never maintained. The plantation was "completely overgrown with other plants and trees due to the lack of maintenance, and there is no hope of any recovery." Id. ¶ 66.

23.     On April 23, 2019, Floresteca B.V. petitioned for bankruptcy in the Netherlands and has since emerged as a reorganized entity. This proceeding was disastrous for the investors that the Applicant represents. Floresteca B.V. spent some €1.5 million on bankruptcy professionals. Many of the claims that the individual investors had were deemed to be claims contingent on harvesting, which was unlikely to occur. Those claims were, therefore, valued at

zero and not admitted, leaving these investors without a voice in the bankruptcy. A large creditor also appeared claiming to have lent €59 million. This creditor fund would not disclose, however, the source of its funding, citing privacy. This claim was admitted. Id. ¶¶ 50-51.

24.     The result was the approval of a binding reorganization plan leaving many investors with no claim at all against Floresteca B.V. Id. ¶ 52. "[H]owever, Floresteca B.V.'s reorganization does not prevent claims from being asserted and pursued against the promoters and related entities." Id. ¶¶ 53, 79.

25.     The Applicant has retained counsel at Bavelaar & Bavelaar Advocaten Rechtsanwaelte, Id. ¶1, 3, who intend to file a claim on the Applicant's behalf seeking to pierce the corporate veil and assert claims of breach of contract and fraud against related parties. Id. ¶ 77-78, 80. In the Netherlands, plaintiffs do not have a right of reply and are expected to present all their evidence upon filing their claim. Id. ¶ 83; Mees v. Buiter, 793 F.3d 291, 296 (2d Cir. 2015).

26.     The discovery sought herein consists of records regarding the clearing of funds transfers and checks through financial institutions and networks of respondents in this District. Bavelaar Decl. ¶ 67-75. "[T]he Applicant expects that the evidence sought herein will be the primary evidence in the foreign proceeding to support the Applicant's corporate veil piercing theory." Id. ¶ 83.

## MEMORANDUM OF LAW

### I.    OVERVIEW OF 28 U.S.C. § 1782 AND THE STATUTORY THRESHOLD FOR GRANTING RELIEF

27.     "Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 247 (2004). Section 1782 "provide[s] for

assistance in obtaining documentary and other tangible evidence as well as testimony." Id. at 248.

The statute reads, in pertinent part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure. A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

28 U.S.C. § 1782(a).

28.    Put succinctly, in order for the Court to be authorized to grant judicial assistance in the form of an order for discovery pursuant to § 1782, the statute sets a mandatory threshold that (1) a person, from whom evidence is sought, reside or be found in the District of this Court; (2) the evidence be for use in a foreign proceeding; and (3) be pursuant to a foreign tribunal request or upon application of an interested party. [1]

---

[1] District courts may, and typically do, grant § 1782 relief on an ex parte basis. Gushlak v. Gushlak, 486 F. App'x 215, 217 (2d Cir. 2012) ('[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 ex parte. The respondent's due process rights are not violated because he can later challenge any discovery request by moving to quash pursuant to Federal Rule of Civil Procedure 45(c)(3)."); In re Tokyo Dist., 539 F.2d 1216, 1219 (9th Cir. 1976) ("Letters Rogatory are customarily received and appropriate action taken with respect thereto ex parte. The witnesses can and have raised objections and exercised their due process rights by motions to quash the subpoenas.").

## II.    DISCRETIONARY FACTORS

29.    Once the statutory requirements set forth in § 1782 are met, the Court is free to exercise its broad discretion to grant relief. The discretionary factors recited by the Supreme Court in Intel guide the Court's discretion:

(1)    whether "the person from whom discovery is sought is a participant in the foreign proceeding," Intel, 542 U.S. at 264, because "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach," Id., and therefore their evidence may be "unobtainable absent § 1782(a) aid," Id.;

(2)    "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government, the court, or agency abroad to federal-court judicial assistance," Id.;

(3)    "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States," Id. at 264-65; and

(4)    whether the § 1782(a) request is "unduly intrusive or burdensome," Id. at 265.

30.    This discretion is further informed by "§ 1782(a)'s twin aims of 'providing efficient assistance to participants in international litigation and encouraging foreign countries by example

---

Moreover, a survey of cases citing Intel reveals that the use of ex parte applications is widespread and, in many cases, unremarked upon (and thus approved of sub silentio). See, e.g., Brandi-Dohrn v. IKB Deutsche Industriebank AG, 673 F.3d 76, 78 (2d Cir. 2012); Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc., 747 F.3d 1262, 1266 (11th Cir. 2014); Moloney v. United States, 685 F.3d 1, 6 (1st Cir. 2012), cert. denied, 569 U.S. 942 (2013); In re Clerici, 481 F.3d 1324, 1329 (11th Cir. 2007).

to provide similar means of assistance to our courts.'" Intel, 542 U.S. at 252 (quoting Advanced Micro Devices, Inc. v. Intel Corp., 292 F.3d 664, 666 (9th Cir. 2002)).

## ARGUMENT

## I.    THIS REQUEST MEETS THE STATUTORY THRESHOLD AUTHORIZING THIS COURT TO GRANT RELIEF

31.    As set forth below, this Request meets the statutory requirements authorizing this Court to grant relief pursuant to § 1782.

### A.    The Parties from whom Discovery is Sought Reside or Are Found in this District

32.    Whether a § 1782 respondent "resides or is found," 28 U.S.C. § 1782(a), in this District is determined by whether this Court has either general or specific jurisdiction over the respondent. In re del Valle Ruiz, 939 F.3d 520, 534 ("§ 1782's 'resides or is found' language extends its reach to the limits of personal jurisdiction consistent with due process").

33.    The Applicant is seeking to obtain discovery from ten banks and two operators of clearing and settlement networks. Bavelaar Decl. ¶¶ 73, 75. The ten banks all act as correspondent banks in the United States for, and maintain correspondent account on behalf of, foreign financial institutions. "Correspondent accounts are accounts in domestic banks held in the name of [] foreign financial institutions. Typically, foreign banks are unable to maintain branch offices in the United States and therefore maintain an account at a United States bank to effect dollar transactions." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 56 n. 3 (2d Cir. 2012) (quoting

Sigmoil Res., N.V. v. Pan Ocean Oil Corp., 650 N.Y.S.2d 726, 727 (N.Y. App. Div. 1996)). Funds transfers and check clearing globally, particularly those in U.S. dollars, clear via these banks. Bavelaar Decl. ¶¶ 67-71. The two operators of clearing and settlement networks, The Clearing House Payments Company L.L.C. and the Federal Reserve Bank of New York, operate the primary clearing and settlement networks in the United States. Id. ¶ 75. Collectively, the banks and operators of the clearing and settlement network generally have and retain in their possession, custody, and/or control the entire message accompanying the funds transfer or the image of the check (as the case may be). The information contained therein include "the originator, the beneficiary, their account details, the amount transferred, and the reference fields." Id. ¶ 70.

34.     In respect of New York branches of foreign banks, the courts have not been consistent in finding whether personal jurisdiction exists because they have, as an extension of the separate entity rule, general personal jurisdiction over the branch (but not the foreign bank as a whole) or whether they have specific personal jurisdiction over the foreign bank in respect of their activities in New York, although both approaches lead to the same result. On the one hand, determining whether personal jurisdiction over a foreign defendant in federal question cases exists (and § 1782 cases have been held to be federal question cases under § 1331, United Co. v. Trafigura A.G., No. 3:11mc17 (SRU), 2011 WL 1045532 (D. Conn. Mar. 16, 2011) (citing, inter alia, Bayer AG v. Betachem, Inc., 173 F.3d 188, 189 (3d Cir. 1999) ("The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1782.")) "requires a two-step inquiry. First, we look to the law of the forum state to determine whether personal jurisdiction will lie. If jurisdiction lies, we consider whether the district court's exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the Constitution." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 168 (2d Cir. 2013). New York state courts, however, are more inclined

not to find the New York branch to be a foreign defendant and more readily find the New York branch to be subject to the general jurisdiction of the New York court. B & M Kingstone, LLC v. Mega Int'l Com. Bank Co., 15 N.Y.S.3d 318, 324 (N.Y. App. Div. 2015) (the New York Supreme Court has "general personal jurisdiction over the bank's New York branch"). However, federal courts in New York appear to have a preference for finding specific personal jurisdiction over the foreign bank in respect of its New York branch rather than general personal jurisdiction. E.g., Knight v. Standard Chartered Bank, 531 F. Supp. 3d 755, 765 n.2 (S.D.N.Y. 2021) (In case where Dubai and New York branches were named as defendants, court found that only specific personal jurisdiction could apply, implicitly rejecting general personal jurisdiction over the New York branch and agreeing "as defendants explain, these branches are 'not separate legal entities capable of being sued.' Def. Mem. at 9 [sic];[2] *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 51 (2d Cir. 2012) (holding that where a New York branch of a foreign bank 'is not separately incorporated, [it] has no legal identity separate from [the parent Bank]'); *Greenbaum v. Handlesbanken*, 26 F. Supp. 2d 649, 652 (S.D.N.Y. 1998) (Sotomayor, J.) ('[T]he law seems fairly well-settled that the domestic branch of a foreign bank is not a separate legal entity under either New York or federal law.')"); but see, In re W. Afr. Min. Trading Ltd., No. 24 Misc. 114 (DEH), 2024 WL 3862293, at *2 (S.D.N.Y. Aug. 19, 2024) (finding UBS AG's New York branch to be subject to the general personal jurisdiction of the court).

35.    This Application assumes that the correct analysis regarding foreign banks with New York branches is specific personal jurisdiction over the foreign bank; however, the Applicant pleads, in the alternative, that the New York branch is subject to the general personal jurisdiction

---

[2] The correct citation is Def. Mem. 15.

of this Court and that either approach leads to the same result of this Court having jurisdiction over each of the intended respondents.

36.    Banco do Brasil, S.A. is a Brazilian bank headquartered in Brasilia that maintains a New York branch at 535 Madison Ave., New York, NY 10022, through which Banco do Brasil, S.A. acts as a U.S. intermediary bank for banks in Brazil (and Argentina), maintains the relevant correspondent banking accounts for these banks, and is thus subject to the specific personal jurisdiction of this Court for this Application.

37.    Bank of America, N.A. is a national association headquartered in Charlotte, North Carolina, that conducts its intermediary banking operations and maintains the relevant correspondent banking accounts for these foreign banks at its branch located at 222 Broadway, New York, NY 10038 and is thus subject to the specific personal jurisdiction of this Court for this Application.

38.    Citibank, N.A. is a national association headquartered at 388 Greenwich St., New York, NY 10043 and thus subject to the general personal jurisdiction of this Court.

39.    Deutsche Bank Trust Co. Americas is incorporated in New York; headquartered at 10 Columbus Cir., New York, NY 10019; and thus subject to the general personal jurisdiction of this Court.

40.    Federal Reserve Bank of New York is one of the Federal Reserve Banks constituted pursuant to the Federal Reserve Act of 1913; headquartered at 33 Liberty St., New York, NY 10045; and thus subject to the general personal jurisdiction of this Court.

41.    HSBC Bank USA, N.A. is a national association headquartered at 66 Hudson Blvd. E., New York, NY 10001 and thus subject to the general personal jurisdiction of this Court.

42.    <u>JP Morgan Chase Bank, N.A.</u> is a national association headquartered at 383 Madison Ave., New York, NY 10017 and thus subject to the general personal jurisdiction of this Court.

43.    <u>Standard Chartered Bank</u> is a British bank headquartered in London that maintains a New York branch at 1095 Avenue of the Americas, New York, NY 10036, through which it acts as a U.S. intermediary bank for banks worldwide and maintains the relevant correspondent banking accounts for these banks, and is thus subject to the specific personal jurisdiction of this Court for this Application.

44.    <u>The Bank of New York Mellon</u> is a Delaware corporation headquartered at 240 Greenwich St., New York, NY 10286 and thus subject to the general personal jurisdiction of this Court.

45.    <u>The Clearing House Payment Company L.L.C.</u> is a Delaware limited liability company headquartered at 1114 Avenue of the Americas, Fl. 17, New York, NY 10035 and thus subject to the general personal jurisdiction of this Court.

46.    <u>UBS AG</u> is a Swiss bank headquartered in Zurich and Basel that maintains a New York branch at 299 Park Ave., New York, NY 10171, through which it acts as a U.S. intermediary bank and maintains the relevant correspondent banking accounts, and is thus subject to the specific personal jurisdiction of this Court for this Application.

47.    <u>Wells Fargo Bank, N.A.</u> is a national association with its headquarters in Sioux Falls, South Dakota, that primarily conducts its intermediary banking operations at its International Branch located at 30 Hudson Yards, Fl. 63, New York, NY 10001 and is thus subject to the specific personal jurisdiction of this Court for this Application.

48.    Because each of the intended discovery respondents is subject to either the general or specific jurisdiction of this Court, the statutory requirement that the respondent reside or be found in this District is satisfied.

### B.    The Evidence Sought Is for Use in a Foreign Proceeding

49.    "The Applicant intends to file a claim with causes of action sounding in breach of contract and fraud (which in Dutch law has a very wide definition and includes, inter alia, fraudulent misrepresentation and conversion) for monetary damages before the District Court (*Rechtbank*) in Amsterdam, which is a first instance court of ordinary jurisdiction." Bavelaar Decl. ¶ 73. The Second Circuit has found this prong satisfied in respect of contemplated proceedings, Mees, 793 F.3d at 299-300 (2d Cir. 2015) (quoting Intel, 542 U.S. at 259) (foreign proceeding "within reasonable contemplation" meets § 1782 statutory requirement), before this same court, i.e., the District Court in Amsterdam. Id. (Although the case refers to "the Dutch proceeding," 793 F.3d at 294, 299, both the applicant-appellant's caption of the case and brief make clear that the foreign proceeding is before "the District Court of Amsterdam," Br. for Applicant-Appellant 13, Dkt. No. 23.); Allianz Glob. Invs. GmbH v. Bank of Am. Corp., No. 1:18-cv-10364-LGS-SDA, 2022 WL 2168916, at *8 (referring to Rechtbank as District Court).

50.    In sum, a contemplated proceeding before the Rechtbank in Amsterdam satisfies the statutory requirement that the evidence be sought for use in a foreign proceeding.

### C.  The Applicant is an Interested Party

51.     The Applicant is the intended plaintiff in the contemplated foreign proceeding, and it is well-settled that the actual litigants in the foreign proceeding are clearly interested persons for the purpose of § 1782. Intel, 542 U.S. at 242 ("Section 1782(a) plainly reaches beyond the universe of persons designated 'litigant.' With significant participation rights in Commission proceedings, the complainant qualifies as an 'interested person' within any fair construction of that term."); Mees, 793 F.3d at 304 (plaintiff of contemplated foreign proceeding is indisputably an interested person). Therefore, the Applicant satisfies the statutory requirement that it be an interested person.

## II.    THE COURT SHOULD EXERCISE ITS DISCRETION IN FAVOR OF GRANTING RELIEF

52.     As noted in paragraph twenty-nine, supra, once the District Court has determined that the mandatory requirements for relief under § 1782 are met, the Court is free to grant assistance, including leave for discovery, in its discretion.

### A.  First Intel Factor: Whether the Persons from whom Discovery Is Sought Are Participants in the Foreign Proceedings

53.     None of the persons from whom discovery is sought, ¶ 36-47, supra, are the intended defendants in the foreign proceeding nor will likely be a party to the foreign proceeding. Bavelaar Decl. ¶ 76. ("The Applicant is not aware of any facts that would support any of the requested subpoena respondents from being named as a defendant or otherwise being a party to

the contemplated proceeding in the Netherlands, and I believe it to be most unlikely that any of them will become a party to the contemplated proceeding in the Netherlands.") (citation omitted).

54.    For this reason, the first Intel factor weighs in favor of granting the relief sought herein.

### B. Second Intel Factor: The Nature of the Foreign Tribunal and whether the Foreign Court Is Receptive to U.S. Federal Court Assistance

55.    As noted in paragraph forty-nine, supra, the District Court in Amsterdam is a first instance court of ordinary jurisdiction that this Circuit has previously found to be a foreign tribunal for § 1782 purposes (albeit under the statutory "for use" prong as the Second Circuit remanded the case to the District Court for consideration of the discretionary factors). Mees, 793 F.3d at 299, 301.

56.    As stated in the Bavelaar Declaration, "The evidence produced pursuant to this Application will, in all likelihood, be admissible as evidence in the contemplated proceeding in the Netherlands," Bavelaar Decl. ¶ 83, underscoring that the Rechtbank will be receptive to this Court's assistance and the evidence produced as a result. "Other U.S. courts have also found that Dutch courts are generally receptive to evidence obtained through Section 1782." In re Seafox Int'l Ltd., No. 4:25-MC-02074, 2025 WL 3085725, at *3 (S.D. Tex. Nov. 4, 2025) (citing In re NJSC Naftogaz of Ukr., No. 3:18-MC-92-L-BK, 2019 WL 13203773, at *2 (N.D. Tex. Sept. 30, 2019); In re Stati, No. 15-MC-91059-LTS, 2018 WL 474999, at *7 (D. Mass. Jan. 18, 2018); In re Duizendstraal, No. 3:95-MC-150-X, 1997 WL 195443, at *2 (N.D. Tex. Apr. 16, 1997)).

57.    For these reasons, the second Intel factor weighs in favor of granting the relief sought herein.

### C. Third Intel Factor: Whether this Request Conceals an Attempt to Circumvent Foreign Proof-gathering Restrictions or Other Policies of the Foreign Country or the United States

58.     As noted in the argument under the second Intel factor, the sought-after evidence in this Application will in all likelihood be admissible in the contemplated proceeding in the Netherlands, ¶ 56, supra, supporting also the third Intel factor in that this request does not attempt to circumvent the foreign proof-gathering restrictions or other policies of the Netherlands. Moreover, the Netherlands does not affirmatively prohibit foreign discovery; in fact, a litigant is able to obtain and submit evidence through any lawful means. Bavelaar Decl. ¶ 83 ("the relief sought in this Application does not circumvent any prohibition in evidence gathering. Firstly, as a ground rule in Dutch law, anything that is not prohibited is permitted, and there is nothing in Dutch law or civil procedure that prevents a party from gathering evidence by any lawful means."); see also, Mees, 793 F.3d at 303 n.20 ("That a country does not enable broad discovery within a litigation does not mean that it has a policy that restricts parties from obtaining evidence through other lawful means. . . . Buiter does not contend that Dutch courts reject the use in litigation of materials obtained through § 1782."); Seafox, 2025 WL 3085725, at *3 ("Further, given the general receptiveness of Dutch courts to Section 1782 applications, it appears unlikely that Seafox's Request is an attempt to evade Dutch law").

59.     Furthermore,

a plaintiff does not have a right to file a reply to the defendant's response. A plaintiff can only do so upon leave from the court or the court's own motion and order, and, in the general course of litigation, Dutch courts only sparingly grant such leave. The Dutch Code of Civil Procedure is clear, a plaintiff has the obligation upon filing a case to disclose all evidence, upon which it relies. Art. 111, lid 3, Rv. (Neth.). It

is, therefore, incumbent on the Applicant, prior to filing its case, to gather all evidence including the evidence sought in this Application.

Bavelaar Decl. ¶ 83. U.S. courts have acknowledged this distinction of Dutch civil procedure when considering § 1782 applications to similarly situated plaintiffs of contemplated Dutch proceedings. Mees, 793 F.3d at 296.

60.     This Application also does not circumvent the policies of the United States. "[T]he only clear nationwide policy that the United States has articulated with respect to discovery in aid of foreign proceedings is the policy embodied in 28 U.S.C. § 1782, and that policy is to promote efficient assistance to participants in international litigation and to encourage foreign courts to provide reciprocal assistance. *See ZF Auto. US, Inc. v. Luxshare, Ltd.*, 142 S. Ct. 2078, 2088 (2022); *Schmitz v. Bernstein Liebhard & Lifshitz LLP*, 376 F.3d 79, 84 (2d Cir. 2004)." Takagi v. Twitter, Inc. (*In re* Takagi), No. 22-mc-80240-VKD, 2023 WL 1442893, at *7 (N.D. Cal. Feb. 1, 2023). The relief sought after herein comports with the U.S. policy to provide and promote efficient assistance to litigants in foreign proceedings.

61.     For these reasons, the third Intel factor weighs in favor of granting the Application.

### D.  Fourth Intel Factor: Whether this Request is Overly Burdensome or Intrusive

62.     The underlying facts in the contemplated foreign proceeding involve a multinational financial fraud involving total losses of €570 million and spanning at least three continents (Europe, South America, and Asia). Given the amounts involved, seeking the financial records of the fraud's participants and parties related to them is proportionate and reasonable. The subpoena respondents collect the sought-after records within their ordinary course of business. Bavelaar Decl. ¶ 70. Moreover, "the Applicant expects that the evidence sought herein will be the

primary evidence in the foreign proceeding to support the Applicant's corporate veil piercing theory," Id. ¶ 83, supporting the relevance of the evidence sought pursuant to this Application.

63.     It is also the Applicant's case that the promoters engaged in a single fraud allowing the Applicant to claim damages going back to its commencement in 1993. Id. ¶ 84. Therefore, in this particular case, seeking records dating back to 1993 is both relevant and justified. At the same time, the Applicant acknowledges that the subpoena respondents may not have records going back to 1993 and does not have any expectation that they produce records that they do not have in their possession, custody, and/or control at the time that a subpoena is served on them. Id. ¶ 73, n.5. ("I understand that some of the subpoena respondents may not have records going back that far presently in their possession, custody, and/or control, and I do not expect the production of such documents that a subpoena respondent no longer has in its possession, custody, and/or control. The subpoena respondents would only be expected to produce those responsive documents that they have in their possession, custody, and/or control at the time of the service of any subpoena.").

64.     On the facts of this case, the fact that the intended respondents have the records in their ordinary course of business, and the understanding that the Applicant has regarding the availability of older records, the fourth Intel factor weighs in favor of granting the relief sought herein as the request is not overly burdensome or intrusive.

## CONCLUSION AND REQUESTED RELIEF

65.     Because this Application meets the § 1782 statutory requirements and the Intel factors weigh in favor of granting the requested relief, the Applicant respectfully requests an order of this Court authorizing it to serve subpoenas duces tecum on the respondents as set forth in

paragraphs thirty-six to forty-seven, <u>supra</u>, to compel the production of funds transfer and check clearing records from 1993 to the present involving in any way any party that the Applicant in good faith believes is associated with the fraud complained of in this Application, including, but not limited to, any intended defendant, Bavelaar Decl. ¶ 80; any entity, with which any of them are or were associated, whether as shareholder, beneficial owner, director, officer, employee, agent, representative, signatory, counterparty, affiliate, subsidiary, or otherwise; and any shareholder, beneficial owner, subsidiary, director, officer, employee, agent, representative, signatory, counterparty, affiliate, and/or other associate of such an entity. <u>Id.</u> ¶¶ 73, 75.


November 30, 2025                                    Respectfully submitted,

                                                                 <u>*/s/ Markus A. Stadler*</u>
                                                                 Markus A. Stadler
                                                                 *Attorney for the Applicant*

                                                                 MK SOLICITORS L.P.
                                                                 P.O. Box 4740
                                                                 Road Town
                                                                 Tortola VG1110
                                                                 British Virgin Islands
                                                                 (284) 494-2444
                                                                 mstadler@mks.law

## <u>WORD COUNT CERTIFICATE</u>

Pursuant to Local Civil Rule 7.1(c), I certify that this Application contains 5,969 words (exclusive of the caption, signature block, and this certificate), as computed by Microsoft Word.

November 30, 2025

*/s/ Markus A. Stadler*
Markus A. Stadler
*Attorney for the Applicant*

MK SOLICITORS L.P.
P.O. Box 4740
Road Town
Tortola VG1110
British Virgin Islands
(284) 494-2444
mstadler@mks.law