**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— )
*In Re* Application of )
 )          Misc. Case No. _____
 )
STICHTING BUREAU FRAUDE RECHT & )
GELDZAKEN BELANGENBEHARTIGING EN )
SCHADECLAIMAFWIKKELING )
GEDUPEERDEN GOODWOOD – ATF EN )
FLORESTECA )
 )
 *Applicant* )
 )
for Judicial Assistance to Obtain Evidence )
for Use in a Foreign Proceeding Pursuant to )
28 U.S.C. § 1782 )
———————————————————————— )

<u>**DECLARATION OF DR. PAUL BAVELAAR LL.M. IN SUPPORT OF THE**</u>
<u>**APPLICATION FOR JUDICIAL ASSISTANCE TO OBTAIN EVIDENCE FOR USE**</u>
<u>**IN A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782**</u>

I, Paul Bavelaar, declare:

**I.      Introduction**

1.   I am the managing partner of Bavelaar & Bavelaar Advocaten Rechtsanwaelte
("Bavelaar & Bavelaar"), a law firm in the Netherlands and Germany, where I have been
admitted to practice law since 1993 and 1996, respectively, and I am familiar with the laws
of both jurisdictions.

2.   I respectfully submit this Declaration in support of the Applicant's application pursuant to
28 U.S.C. § 1782 seeking judicial assistance from this Court in aid of foreign litigation

1

(the "Application"), specifically for an order authorizing the Applicant to serve subpoenas duces tecum on various financial institutions, the Federal Reserve Bank of New York, and The Clearing House Payments Company L.L.C., all of which are in New York County, as detailed further herein. ¶¶ 74, 76, infra.

3. My knowledge of the facts in this Declaration derives from the documents, records, and information provided by the Applicant and Bavelaar & Bavelaar's work under my supervision investigating, on behalf of the Applicant, the circumstances into the investments made in the Netherlands by approximately 13,600 victims from 1993 to 2019 into the Floresteca group of companies in the Netherlands with Brazilian subsidiaries, the Goodwood group of companies in the Netherlands, and Dutch foundations, all of which were promoted by Henk C. Van Druten; Laurentius P.A. Brouns; Sylvio de Andrade Coutinho; Sylvio de Andrade Coutinho, Jr.; Rende A. Feitsma; and certain additional apparent nominees that have changed over time in an ever changing web of companies and foundations all linked to these same individuals.

4. The promoters sold investments in the Netherlands to individual investors purportedly related to teakwood projects in Brazil. However, as detailed further herein, it is the Applicant's case that these companies and individuals were engaged in a wide-ranging fraud that evolved over the years but was part Ponzi scheme, part purported transfer of titles of land that did not transfer any land and included purported transfers of land that the fraudsters did not own, part transferring the interest in the same revenue stream to multiple investors, and part self-dealing with the little teakwood that was harvested so that the investors would not realize a return.

5.  To be clear, however, and as further described herein, some investors were made whole, particularly at the beginning, but the majority were not and lost their entire investment. Those investors that were made whole were generally done so with fresh investor funds coming in, i.e., a Ponzi scheme, and not because of any genuine return on an investment arising from the promoters' purported investments and business activities.

6.  Because this fraud was directed towards Dutch investors, most of the large volume of supporting documentary evidence that I rely on for the facts as stated in this Declaration, in particular contracts and correspondence with investors, is in Dutch, and a smaller number of documents are in Portuguese. As the Applicant's resources as a foundation collectively representing individual fraud victims are limited, sworn English translations have not been made but can be prepared and provided to this Court should it request so.

## II.     The Applicant

7.  The Applicant is the Stichting Bureau Fraude Recht & Geldzaken Belangenbehartiging en Schadeclaimafwikkeling Gedupeerden Goodwood – ATF en Floresteca, whose literal translation from Dutch is "Foundation for Fraud Law & Money Matters Advocacy and Claim Settlement of Victims Goodwood – ATF and Floresteca." The Applicant is a Dutch foundation founded specially by the Stichting Bureau Fraude Recht & Geldzaken ("BFRG"),[1] a Dutch foundation that represents victims of fraud generally, to represent and advocate for the victims of this specific fraud explained herein. The Applicant is registered in the business register of the Chamber of Commerce (*Kamer van Koophandel*) under number 72403543.

---

[1] Literally translated from Dutch as the "Foundation for Fraud Law & Money Matters"

8.  Underscoring the Applicant's raison d'être, the Applicant's registered activities with the Chamber of Commerce are in the category "Other Advocacy" and are

> For and on behalf of the interested parties registered with the foundation who are in any way involved in or have a claim to:
>
> - Floresteca Holding N.V., with its registered office in Amsterdam;
> - Goodwood Investments B.V., with its registered office in The Hague;
> - Goodwood Direct Marketing B.V, with its registered office in Zaandam;
> - Amazon Teak Foundation, with its registered office in Amsterdam;
> - Stichting Administratie- en Trustkantoor Tectona ("Tectona Administration and Trust Foundation"), with its registered office in Amsterdam;
> - the legal successors as well as other successors in the assets of the aforementioned entities; and
> - one or more companies affiliated with the aforementioned entities, subsidiaries or partnerships, joint ventures, and/or other (legal) persons both in the Netherlands and abroad
>
> to represent their (collectively similar) interests, in particular but not limited to:
>
> - conducting collective actions, both judicially and extrajudicially;
> - taking precautionary or urgent or executory measures;
> - filing reports and promoting criminal prosecution; and
> - entering into, elaborating, and executing collective settlement agreements and compromises and supervising compliance with such agreements.

9.  The Applicant represents approximately 1,200 individual investors pursuant to powers of attorney granted by each of these investors to the Applicant. These victims invested, and lost, a total of approximately €46 million.

### III.     The Fraud

#### A.  Modus Operandi, Generally

10. The <u>modus operandi</u> of the promoters of this fraud evolved since its inception in 1993, and the promoters did not victimize all investors in precisely the same way, with much depending on when the investors first invested. For instance, while the contracts and their terms were similar at the beginning of the fraud in the 1990s, by the mid-2000s, investors appear to have "bespoke" contracts with differing terms, particularly in terms of the expected returns, duration, and purported liens on collateral. While I can only speculate why this was the case, I believe that a plausible inference is that the fraudsters had no intention of making any further payments to investors and set the terms to whatever was needed in a particular case for victims to part with their money.

11. Broadly speaking, however, the promoters, directly and through brokers selling participations in specially created entities under the promoters' control, would capture investors for the promoters' claimed teakwood projects in Brazil. The assets were misstated in that the promoters controlled far less land than stated, and the promoters pledged security interests multiple times to the same profit streams and land (which they did not necessarily own and therefore could not transfer any rights at all), all of which was not disclosed to the investors. Additionally, to divert funds that properly belonged to the investors, undisclosed sales and marketing agreements, the value of which bore no relationship to and were grossly in excess of the value of the little teakwood that was, in fact, harvested, were made with companies related to the promoters, in which the investors had no interest, so that not only were there no profits available for the investors, but the companies, in which the investors

had their interest, would be lossmaking to the point of insolvency. Nominees would be put into place before the company entered formal bankruptcy so that the promoters would not be disqualified from being directors of other companies (leaving the nominees to be disqualified). A new company then would appear and be presented to investors, sometimes as a purportedly arm's length company expressing interest in acquiring their interests. In exchange for swapping their participations and a further fresh investment, investors could then acquire high yielding bonds and other security instruments issued by this "new" company to have rights to profit streams from the teakwood projects that this "new" company was supposed to put into operation, now supposedly under better, different management. However, the stated backers and directors of this new company were merely nominees for the original promoters, and the promoters were, in fact, revictimizing the investors. This new company would also then ultimately fail.

12. Initially, there were two distinct investments offered. One investment was a fixed loan product. Those investors that extended loans were fully repaid in the 1990s, likely with the proceeds from the other product, which purported to transfer the title in specific parcels of land with specific quantities of teakwood trees to investors with guaranteed payment streams over the course of twenty-five years based on thinnings starting in year ten. However, the purported owner of the land, Floresteca Agroflorestal Ltda., a Brazilian subsidiary of Floresteca B.V., did not have title to the land, and the bogus certificates of ownership issued would not have met the formal requirements of Brazilian (or Dutch) law to transfer the interest in the land even if Floresteca Agroflorestal Ltda. had title. From this second investment, except for a few instances where individual investors sued (or had engaged lawyers who issued demand letters) and the lawsuits (or threatened lawsuits) were quietly settled or the debts enforced on assets held in the Netherlands (i.e., funds in bank

accounts) by way of a summary collection procedure, particularly in the late 2000s and very early 2010s, investors have not recovered the principal of their investments, and most investors have received no money at all. Floresteca Agroflorestal Ltda. made one voluntary payment that was due upon the second thinning in 2004 to those investors who invested in 1993-94.

13. The year 2004 was a time, however, when the promoters were still actively capturing new investors and investments. There is no evidence that the thinning occurred, and I suspect and infer that, to keep their fraud ongoing, the promoters found it necessary to make the payments contractually due and used fresh investor funds to do so.

14. Separately, Floresteca B.V. made certain payments involuntarily in the 2011-13 and 2018-19 periods to those investors who sued when Floresteca B.V. failed to pay the coupon payments became due on bonds that it issued from 2008 onwards and enforced those judgments on funds held in the Netherlands.[2] However, the bulk of the invested funds, totaling €570 million, have almost entirely disappeared, having been apparently fraudulently diverted and not used for their intended purpose.

15. Floresteca B.V. entered into bankruptcy on April 23, 2019, and emerged with an approved reorganization plan, to which the Applicant objected as further described below.

---

[2] Those bonds did not have an acceleration clause that would make the principal due upon the default.

**B.  The Fraud Begins: Amazon Teak Foundation and Floresteca**

16. In 1993 and 1994, Messrs. Van Druten and Brouns and Dr. Coutinho with Mr. Feitsma as manager began this scheme by setting up three companies in Brazil (Floresteca Panflora Agroflorestal Ltda., Foresteca Agroflorestal Ltda., Floresteca Agroflorestal Ltda. (later Floresteca S.A.)) to own and manage plantations in Brazil to grow and harvest teakwood.

17. In parallel, Messrs. Van Druten and Brouns set up the Amazon Teak Foundation ("ATF"), Floresteca B.V., and Floresteca Holding N.V. in the Netherlands.

18. ATF was set up to be the owner of the teakwood plantations in Brazil.

This scheme was a fraud from day one and never a legitimate investment. Already in 1993, ATF, Stichting Administratie- en Trustkantoor ATF (the "Administration and Trust Office ATF Foundation") as trustee, Foresteka Agroflorestal Ltda., and the "Buyer" (i.e., individual investor) entered into quadripartite contracts whereby, <u>inter alia</u>, the Buyer would purportedly acquire title to a specific plot number of a plantation from Foresteka Agroflorestal Ltda., ATF would manage the plot, and the Administration and Trust Office ATF Foundation was the supposed trustee protecting the investor. At the beginning, the same person, usually Mr. Brouns, would sign for all three parties, not even seeking to mask the obvious conflict of having the same person who was supposedly protecting the investor's interests being the corporate manager of the plantation at the same time. Later in the 1990s, the promoters would see to it that different persons signed for the different parties in the contracts entered into with investors

19. In conjunction with the aforementioned sales, Foresteka Agroflorestal Ltda., issued very nice-looking certificates in relation to specific teakwood plantations that it purported to own that transferred title in specific plots and number of trees to the investors. However, Foresteka Agroflorestal Ltda. did not have legal title to the land that it purported to transfer. Furthermore, under Brazilian law (which is substantially similar as to Dutch law on this point), the portion of the contract regarding the transfer of land and the accompanying certificate would have had to have been entered into as a notarial act before a Brazilian public notary who as part of the notary's duties would verify the title, publicly record the act, and transfer the title. In sum, these "Certificates of Ownership" were worth no more than the paper, on which they were printed.

20. In 1995, Floresteca B.V. (which was owned by Floresteca Holding N.V., whose ultimate beneficial owner was Mr. Brouns); its subsidiary, Floresteca Agroflorestal Ltda.; and ATF entered into a Foresting and Recognition of Rights over Construction Agreement (the "Foresting Agreement") whereby (a) Floresteca Agroflorestal Ltda. assumed the maintenance and operations of ATF in return for the cession of economic rights over the trees to Floresteca Agroflorestal Ltda. and (b) Floresteca B.V. loaned Floresteca Agroflorestal Ltda. to pay for the construction and maintenance of the plantations. ATF, in turn, was obligated to repay Floresteca Agroflorestal Ltda. the sum of the actual amount Floresteca Agroflorestal Ltda. had expended over the years and a variable amount based on ATF's final profit for the respective plantation.

21. The existence of the Floresteca group of companies and the Foresting Agreement was not initially disclosed to the individual investors. However, on August 14, 1997, investors in ATF were offered the "opportunity" to invest also in Floresteca Agroflorestal Ltda. (which

purportedly owned Brazilian teakwood plantations as well) at a price of NLG 20,000 per hectare if they did so by October 1, 1997.

22. It is unclear whether Floresteca B.V. actually made the payments specified in the Foresting Agreement to Floresteca Agroflorestal Ltda. and, if Floresteca B.V. made the payments, what the source of those payments were. The only known sources of funding for the teakwood project were the funds invested directly into ATF and Floresteca Agroflorestal Ltda., both of which should not have funded Floresteca B.V. Furthermore, given the amounts invested, the need for additional funding from Floresteca B.V. is unclear. The Applicant's investigations have not been able to establish the veracity of Floresteca B.V.'s funding or whether, if such funding occurred, the source of the funding was distinct from the amounts invested in ATF and Floresteca Agroflorestal Ltda.

### C. Goodwood

23. On May 7, 1998, the promoters incorporated Goodwood Investments B.V. ("Goodwood") and its wholly owned subsidiary Goodwood Direct Marketing B.V.

24. Goodwood created and, through its subsidiary, marketed funds that held ATF profit right certificates and sold participation rights to investors. Given that the time needed to grow teakwood for harvesting is twenty to twenty-five years, Goodwood marketed these products as investments to form part of an individual's investment portfolio for retirement.

25. Effective October 1, 1998, ATF and Goodwood entered into a joint venture agreement. In connection therewith, ATF sought that its investors switch from the previous investment structure where investors had rights to specific plots of land to a collective management fund that Goodwood had set up that guaranteed an 18.2% annual return over twenty-five years. ATF has stated that most of its investors accepted the offer to switch, although I have not been able to verify this claim.

26. In sum, ATF purportedly held the legal ownership to the trees while Goodwood had the beneficial interest.

27. In 2004, De Nederlandsche Bank ("DNB"), the Netherlands' central bank prior to the introduction of the euro and banking regulator, commenced an investigation into Goodwood's fund. On May 26, 2005, DNB ruled that Goodwood's guaranteed repayment fund violated paragraph 1 of article 82 of the Act on the Supervision of Credit Institutions 1992.[3] Essentially, Goodwood's fund with a guaranteed repayment was a banking product akin to a certificate of deposit, and Goodwood was not a licensed financial institution. Furthermore, in this instance, to meet its guaranteed return, Goodwood had guaranteed to repurchase the investments, something that Goodwood could only do if it attracted fresh funds.

---

[3] Translated from Dutch: It is prohibited for anyone to attract, obtain, or have available commercially, repayable funds from the public, whether in due course, or to mediate in any form regarding the commercial attracting or making available to the public of funds, whether or not repayable in the long term.

28. In parallel, in 2004 with DNB's investigation into Goodwood underway, ATF became Tectona Administration and Trust Foundation[4] with Messrs. Van Druten and Brouns removing themselves as directors and Mr. Feitsma becoming Chairman of the Board.

29. DNB issued a civil penalty, which Goodwood appealed over the course of 2006 and 2007. The court ruled in favor of DNB and against Goodwood on June 30, 2006, and Goodwood's appeal was dismissed on September 6, 2007.

30. Separately, in January 2008, the Netherlands Authority for the Financial Markets ("AFM") suspended Goodwood's license to sell and market securities.

31. On February 13, 2008, DNB ordered that Goodwood present two proposals to cure its continuing violation in respect of its obligations that it already had assumed with the guaranteed repurchases. One proposal that Goodwood presented was to seek a waiver from DNB, and the second proposal was to remove the guaranteed repurchases. Goodwood then sought the waiver.

32. In analyzing Goodwood's application for a waiver, DNB had requested that there be a third party of sufficient financial backing to guarantee the guaranteed repurchases. Goodwood proposed Floresteca B.V.

---

[4] I note that the Tectona Administration and Trust Foundation, in an apparent attempt to confuse third parties and distance itself from its past activities, has again changed its name on February 24, 2022, becoming Stichting Bewaarder Tectona, or, translated into English, the Tectona Custodian Foundation. At the same time, it also changed its foundation statutes.

33. However, in January 2009. Goodwood advised DNB that it would not be able to honor the guaranteed repurchases because Floresteca B.V. had financial difficulties and could not honor its agreement with Goodwood.

34. In February 2009, with no clear plan how to cure the continuing default regarding having customers with unauthorized guaranteed repurchases, the DNB appointed a receiver over Goodwood.

35. In October 2009, Goodwood issued a press release framed as being "good news." Goodwood would start a new fund and existing clients could trade in their guaranteed rights to profit yields for tradeable shares in the overall investment. However, this fund never came into fruition.

36. Instead, Goodwood filed for bankruptcy, which went into effect on December 7, 2010. The stated reason for its bankruptcy was that, in 2008, Goodwood had sold its rights to the revenue streams to Floresteca B.V. for €3,200,000 but payable in installments over five years. In January 2009, Floresteca B.V. advised Goodwood that it was having financial difficulties and would not be able to make further payments. Having no funds coming in, Goodwood could not honor the repurchase guarantees that it had made.

37. Notwithstanding DNB's position, Goodwood continued to sell approx. €100 million of securities during this period while DNB was investigating and while the matter of the civil penalty was before the courts.

### D.  Floresteca B.V.'s Approach to Goodwood Investors

38. In the years leading up to 2010, Floresteca B.V. approached those parties that had invested through Goodwood with a proposal, although the contracts that Floresteca B.V. actually entered into varied greatly from investor to investor. At this point, the market value of the Goodwood participations was less than half the amount that was originally invested. In a typical proposal, Floresteca B.V. nevertheless offered to value and acquire these participations at 103% of the amount initially invested so long as the investor made an additional cash contribution, in return for receiving a high yielding Floresteca B.V. bond. While there were some maturities as long as thirty years, most were of a much shorter duration of three to five years. Additionally, there was a small "gift" from Floresteca B.V. if the investor accepted the proposal in the form of bonus principal on the bond (i.e., the bonds were purported to be being sold at a discount). Furthermore, often Floresteca B.V. "generously" "waived" the "transaction fee," while others had to pay a €250 transaction fee.

39. To illustrate the preceding paragraph, in one example, an investor had invested €60,000 initially, but the market value had become less than half that amount. Floresteca B.V. offered the investor a bond in the amount of €104,000 in exchange for the Goodwood participations (with an implied valued of €69,000), an additional €31,000 in fresh investment, and €4,000 being a promotional gift by Floresteca B.V. for the investor's acceptance of this proposal.

40. The fact that the initial promoters of Goodwood were also the beneficial owners of Floresteca B.V. and the inherent conflict of interest were not disclosed to these individuals.

41. In effect, the investor referred to in the paragraph 40, <u>supra</u>, has now invested €91,000 in total (€60,000 initially plus €31,000 in fresh investment) and has, to date, received nothing in return.

42. Another example was an individual whose Goodwood investment was arbitrarily valued at €120,000, which the investor traded in, added €40,000 in fresh investment, and was given €17,000 in bonus shares. All this meant was that this investor was further victimized to the tune of €40,000 (as was the investor referred to in paragraph 40, <u>supra</u>, further victimized to the tune of €31,000).

43. The available evidence suggests that Floresteca B.V. had no intention of repaying the bonds that it issued, particularly the shorter duration ones. Floresteca B.V.'s projected revenue streams consisted of (a) the rights in the Goodwood (and ATF) participations (that were based on the profit rights from ATF/Tectona Administration and Trust Foundation) that Floresteca B.V. acquired and (b) the repayment of the loan extended per the Foresting Agreement. The earliest that Floresteca B.V. could have received anything from these incoming cash flows was 2017, years after the shorter duration bonds would have matured.

44. As further evidence of this belief that Floresteca B.V. had no genuine intention of repaying the bonds that it issued (at least not from its purported investments), during Floresteca B.V.'s bankruptcy proceeding, ¶ 51, <u>infra</u>, Floresteca B.V. represented that it had intended to repay the bondholders with fresh investment that never materialized.

45. In my professional opinion, Floresteca B.V.'s representation of its intentions, i.e., paying previous investors off with fresh investment, is the hallmark of a Ponzi scheme.

46. In 2012, unable to meet its bond obligations and facing lawsuits, Floresteca B.V. again approached investors with proposals that were not uniform. The proposals were likely driven by whatever it took for the investor to cease the actions that the investor was undertaking against Floresteca B.V. Some accepted the proposals; others did not.

47. The group of investors that the Applicant represents accepted a five-year moratorium on collection efforts, i.e., until January 1, 2018. Floresteca B.V. promised to pay during this period.

48. During the five-year period, there were hardly any communications from Floresteca B.V. January 1, 2018, came and went, and Floresteca B.V. did not make any required payments.

49. Not only that, but, during this five-year period, Floresteca B.V. also sold plantations in Brazil, ostensibly to resolve its debts, which should have also included its debts to investors (at least on a pro rata basis based on a priority of the debts), yet no investor (with bonds that were ostensibly more senior than other unsecure debt) is known to have received anything. Any debts that Floresteca B.V. repaid were done on a preference basis to parties related to the promoters.

50. Floresteca B.V. sought bankruptcy protection on April 23, 2019. This proceeding appeared to be very curious. The debtor spent some €1.5 million on the bankruptcy professionals, including lawyers and trustees who were from a top Dutch law firm. In this bankruptcy, a

U.S. hedge fund, Crestline Investors Inc., appeared and claimed to have lent through its Crestline Arvore fund some €59 million, making it Floresteca B.V.'s largest creditor. The trustees admitted Crestline Arvore's claim. Long-time investors in Floresteca, including those represented by the Applicant, had never heard of Crestline Arvore or its purported loan. Furthermore, the Applicant has never been able to determine the origin of the funds used by Crestline Arvore to advance the loan in the first place. Crestline Arvore cited privacy as its reason for not disclosing the fund's investors, and the Applicant believes that it is entirely possible that the origin of the funds are Floresteca's promoters or closely related parties, using the very funds that have been wrongfully diverted from victim investors.

51. Additionally, the trustees secured expert opinions deeming many of the types of debts that the individual investors held, contrary to the representations made by the promoters to the investors years prior, to be contingent claims and that the contingency (e.g., harvesting) had not occurred and was unlikely to occur. Many individual investor claims were, therefore, deemed to be valued at zero, leaving them without a voice in the bankruptcy.

52. The admission of the Crestline Arvore claim coupled with the effective write-off of many individual investor claims led to the approval of a reorganization plan, which admittedly a small number of individual investors also approved. Floresteca B.V. has now exited reorganization and is an ongoing concern with a binding reorganization plan that is disastrous for the individual investors that the Applicant represents, many of whom have been left with no claim at all against Floresteca B.V.

53. The binding effects of the reorganization plan and discharged debt frustrate an attempt to assert claims against Floresteca B.V. directly; however, Floresteca B.V.'s reorganization does not prevent claims from being asserted and pursued against the promoters and related entities.

### E.  Quadris and GFGF Funds

54. In 2001, Messrs. Brouns and Van Druten set up Quadris Environmental Forestry Fund ("Quadris") in the Isle of Man with the stated objective to have Floresteca purchase teakwood plantations, the same ones that ATF owned, for which investors in the Netherlands (including some that the Applicant represents) already had profit right certificates.

55. After capturing 1,200 investors totaling over £100 million, Quadris was suspended in 2017. Quadris' investors have also yet to recover their investments.

56. In Quadris' liquidation, Crestline Arvore also appeared as the largest creditor.

57. In 2010, the promoters also set up a fund in Luxembourg, LFP Prime SICAV-SIF S.A. Global Forestry Growth Fund ("GFGF") marketed to European investors outside of the Netherlands. Like Quadris, GFGF, which captured over €100 million in investments, also funded Floresteca's acquisition of teakwood plantations that had pre-existing profit rights certificates in favor of the initial ATF investors.

58. Like all other investors, GFGF's investors have also yet to recover their investments.

59. For the sake of clarity, the Applicant does not represent any of the Quadris or GFGF investors; the Quadris and GFGF investors are entirely, or almost entirely, based outside the Netherlands and are victims of parallel frauds orchestrated by the same promoters that involve the same subject-matter.

### F.  Detrimental Sales Agreements for the Victims

60. In 2005, Dr. Coutinho, a Brazilian who actually owns, directly or indirectly, much of the land that the Floresteca group of companies claimed to have owned, and his relatives founded what is now TRC Agroflorestal Ltda. ("TRC") (TRC standing for Teak Resources Company).

61. In 2017, Floresteca S.A. entered into a Management Services and Timber Sales & Purchase Agreement ("Sales Agreement") whereby TRC has a first right of refusal to buy all the teak produced at roadside prices (i.e., at the price of the teak delivered to the street passing the plantation).

62. One of the many issues with the Sales Agreement is that there is not a large enough market to determine what the roadside price is, so the price is essentially whatever the promoters, who are the ultimate beneficial owners of all the companies involved, wish it to be. Naturally, the price is set to the detriment of the investors who have had no say or even prior knowledge of the Sales Agreement.

63. TRC further sold, and likely continues to sell, the harvested teakwood to related companies, including Teakrc Pte. Ltd., a company in Singapore associated with at least members of the Coutinho family and probably also some of the other promoters.

### G.  Failure to Perform and Destruction of Collateral

64. Some of the investors that the Applicant represents continue to have the profit rights initially sold by ATF, namely to the Buriti and Paraiso plantations, i.e., these investors did not cede these rights in the years up to 2010 in exchange for Floresteca B.V. bonds. See, ¶ 39, supra.

65. The Buruti rights were created in 1994 with a contractual felling in 2019. Satellite pictures show that the trees existed in 2015, but after early 2016, the trees are no longer there. They were felled ahead of schedule without any notice or payment to the investors thereby destroying the collateral.

66. The Paraiso rights were created in 1997. While the trees were planted, satellite imagery shows that the plantation was never maintained. It is completely overgrown with other plants and trees due to the lack of maintenance, and there is no hope of any recovery from this plantation. There was also never any notification to the investors at any point that the plantation was not being maintained.

### IV.    The Requested Relief and Subpoena Recipients

67. The overwhelming majority of cross border funds transfers in U.S. dollars worldwide clear through intermediary banks in New York County.

68. Banks around the world maintain U.S. correspondent banking relationships by way of holding accounts at financial institutions in the United States, usually at branches in New York County. These accounts facilitate funds transfers in U.S. dollars, the global reserve currency, and, to a significantly lesser extent, other currencies.

69. When an originator with an account at a bank in one country wishes to transfer U.S. dollar funds to a beneficiary with an account at a bank in another country, the originator's bank will send a payment message to its correspondent bank in the United States. That correspondent bank will debit the originator's bank account at that correspondent bank. If the beneficiary's bank also has a correspondent banking account at that same correspondent bank, the correspondent bank will credit the funds to that account and forward the payment message to the beneficiary bank for further credit to the beneficiary's account. If the beneficiary's bank does not have a correspondent banking account at that same correspondent bank, the first correspondent bank will send the payment message to the second correspondent bank that has the relationship with the beneficiary's bank. In the process, either the second correspondent's bank account at the first correspondent will be credited or the first correspondent's bank account at the second correspondent bank will be debited prior to the beneficiary bank's account at the second correspondent bank being credited.

70. In clearing these funds transfers, these intermediary banks, of which they are either one or two of them in each transaction depending on whether the originator's bank and the beneficiary's bank share the same intermediary bank in New York County, have in their possession, custody, and/or control the entire payment message accompanying these funds transfers. The information contained in the payment message include, <u>inter alia</u>, the originator, the beneficiary, their account details, the amount transferred, and the reference fields.

71. In addition, checks clear during the collection process through intermediary banks in New York County, and during the collection process for checks, similar information as that for funds transfers may be gleaned from checks and accompanying collection and payment records that are in the possession, custody, and/or control of the intermediary banks.

72. The wire and check records will aid in further proving the wrongdoing, tracing where the victims' funds went and for what they were used, determining the amounts that were obtained by related companies for what trees were harvested, identify entities related to the promoters that may be harboring the diverted funds, identify additional wrongdoers and facilitators, and most importantly further support a piercing the veil claim in the Netherlands to hold the individual promoters and their related entities liable.

73. The Applicant, therefore, respectfully requests that this Court allow the Applicant to serve subpoenas <u>duces tecum</u> seeking the records from 1993[5] to the present of funds transfers

---

[5] I understand that some of the subpoena respondents may not have records going back that far presently in their possession, custody, and/or control, and I do not expect the production of such documents that a subpoena respondent no longer has in its possession, custody, and/or control. The subpoenas respondents would only be expected to produce those responsive documents that they have in their possession, custody, and/or control at the time of service of any subpoena.

and checks for parties that are associated, or believed in good faith to be associated, with the fraud complained of herein on:

  a. Banco do Brasil S.A., where foreign banks maintain their correspondent banking accounts at the New York branch located at 535 Madison Ave., New York, NY 10022;

  b. Bank of America, N.A., where foreign banks primarily maintain their correspondent bank accounts at the branch at 222 Broadway, New York, NY 10038;

  c. Citibank, N.A., which is headquartered at 388 Greenwich St., New York, NY 10043;

  d. Deutsche Bank Trust Co. Americas, which is incorporated in New York and headquartered at 10 Columbus Cir., New York, NY 10019;

  e. HSBC Bank USA, N.A., which is headquartered at 66 Hudson Blvd. E., New York, NY 10001;

  f. JPMorgan Chase Bank, N.A., which is headquartered at 383 Madison Ave., New York, NY 10017;

  g. Standard Chartered Bank, where foreign banks maintain their correspondent banking accounts at the New York branch located at 1095 Avenue of the Americas, New York, NY 10036;

  h. The Bank of New York Mellon, which is headquartered at 240 Greenwich St., New York, NY 10286;

  i. UBS AG, where foreign banks maintain their correspondent banking accounts at the New York branch located at 299 Park Ave., New York, NY 10171; and

j.  Wells Fargo Bank, N.A., where foreign banks primarily maintain their correspondent bank accounts at the "International Branch" located at 30 Hudson Yards, Fl. 63, New York, NY 10001.

74. Banks b-j in the preceding paragraph are the nine primary banks engaged in correspondent banking in the United States. Banco do Brasil, S.A., is Brazil's oldest and second-largest bank, 50% owned by the Brazilian government, and its New York branch holds correspondent banking accounts for banks in Brazil and Argentina, making it a regionally important bank for the discovery sought herein in respect of a fraud involving Brazil.

75. The Applicant also respectfully requests that this Court authorize the Applicant to serve subpoenas duces tecum on The Clearing House Payments Company L.L.C., headquartered at 1114 Avenue of the Americas, Fl. 17, New York, NY 10036, and the Federal Reserve Bank of New York, headquartered at 33 Liberty St., New York, NY 10045, seeking funds transfer and check clearing records for parties associated, or believed in good faith to be associated, with the fraud and processed through the Clearing House Interbank Payment System ("CHIPS") and Fedwire, respectively. CHIPS and Fedwire are the two primary clearing and settlement network systems in the United States.

76. The Applicant is not aware of any facts that would support any of the requested subpoena respondents, ¶¶ 74, 76, supra, from being named as a defendant or otherwise being a party to the contemplated proceeding in the Netherlands, and I believe it to be most unlikely that any of them will become a party to the contemplated proceeding in the Netherlands.

**V.    Use of Evidence in Foreign Proceedings**

77. The Applicant intends to file a claim with causes of action sounding in breach of contract and fraud (which in Dutch law has a very wide definition and includes, inter alia, fraudulent misrepresentation and conversion) for monetary damages before the District Court (*Rechtbank*) in Amsterdam, which is a first instance court of ordinary jurisdiction.

78. Additionally, the Applicant intends to seek to pierce Floresteca B.V.'s corporate veil and directly seek recompense from Messrs. Van Druten, Brouns, Coutinho Jr., and Feitsma, and Dr. Coutinho, and entities under their control and make them jointly and severally liable. The sought-after evidence is intended to assist the Applicant in pleading and proving that the intended individual defendants abused Floresteca B.V.'s (and other companies') corporate form and improperly diverted assets to the detriment of their victims. The evidence will also permit the tracing of such funds in support of the Applicant's civil complaint.

79. Floresteca B.V.'s bankruptcy did not stay or preclude claims against related parties, and the Applicant has standing to bring such claims. Floresteca B.V.'s reorganization plan does not affect the obligations of, and claims against, these other parties. Also, under Dutch law, civil lawsuits against parties in bankruptcy (e.g., Floresteca B.V.) are not automatically stayed, and new proceedings can be initiated. However, a plaintiff who intends to file a lawsuit must first notify the bankruptcy trustee who has the option to accept the claim for damages without the need to resort to further proceedings on the matter.

80. The defendants that the Applicant currently intends to name in the contemplated foreign proceeding before the District Court in Amsterdam are:

    a.  Mr. Brouns;

    b.  Dr. Coutinho;

    c.  Mr. Coutinho, Jr.;

    d.  Mr. Feitsma;

    e.  Mr. Van Druten;

    f.  Floresteca Holding, N.V; and

    g.  Stichting Bewaarder Tectona.

81. I have every expectation that the discovery sought pursuant to this Application will serve to fortify, particularize, and prove the Applicant's case against the wrongdoers as well as improve the prospects of success.

82. The Applicant, whose sole purpose is to seek justice and recover value for the victims of this fraud, has instructed me to proceed with filing a claim in the Netherlands against the wrongdoers with alacrity. I expect the claim to be filed within sixty days after the conclusion of the discovery sought herein.

83. The evidence produced pursuant to this Application will, in all likelihood, be admissible as evidence in the contemplated proceeding in the Netherlands, and the relief sought in this Application does not circumvent any prohibition in evidence gathering. Firstly, as a ground rule in Dutch law, anything that is not prohibited is permitted, and there is nothing in Dutch law or civil procedure that prevents a party from gathering evidence by any lawful means.

Importantly, in the Netherlands, unlike many other jurisdictions, including from what I understand the United States, a plaintiff does not have a right to file a reply to the defendant's response. A plaintiff can only do so upon leave from the court or the court's own motion and order, and, in the general course of litigation, Dutch courts only sparingly grant such leave. The Dutch Code of Civil Procedure is clear, a plaintiff has the obligation upon filing a case to disclose all evidence, upon which it relies. Art. 111, lid 3, Rv. (Neth.). It is, therefore, incumbent on the Applicant, prior to filing its case, to gather all such evidence including the evidence sought in this Application, and the Applicant expects that the evidence sought herein will be the primary evidence in the foreign proceeding to support the Applicant's corporate veil piercing theory.

84. Furthermore, the five-year statute of limitations is tolled in the Netherlands in cases of fraud and is subject to a fraud discovery rule. Also, in the case of a single ongoing, continuing fraud, the plaintiffs can seek damages in respect of the entire fraud, i.e., in this case back to the beginning of the fraud in 1993; the statute of limitations only begins to run at the earliest (i.e., subject to the fraud discovery rule that may provide for a later date, from which the statute of limitations begins to run) upon the final act (which includes a positive omission) by the defendants in furtherance of the fraud. Finally, a possible lapse in the statute of limitations in respect of this fraud does not prevent the filing of the Applicant's case in the Netherlands. The statute of limitations is an affirmative defense that a defendant must plead and prove on a preponderance of the evidence standard. The Applicant anticipates that the defendants may try to separate the frauds in time and then further argue that these earlier, purportedly separate frauds were discoverable at earlier points in time. I stress, however, that the defendants would have to first prevail in separating the frauds in time before the damages for earlier acts could be excluded, and it is the Applicant's case

that it is a single fraud. The statute of limitations defense, if raised by the intended defendants, will be a fact-sensitive inquiry that the Dutch court will have to determine. The sought-after discovery herein will aid the Applicant to establish that the fraud complained of herein (and in the contemplated foreign proceeding) is a single fraud.

### VI.    The Netherlands Court Can Provide Similar Assistance to a Foreign Litigant

85. In the Netherlands, any person, including a foreign litigant, can apply to a Dutch court to seek an order against a third party for the disclosure of evidence to be used in a proceeding. Art. 195a, Rv. (Neth.). There is no requirement that the proceeding, where the evidence will be used, be in the Netherlands.

### VII.   Conclusion

86. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:        Amsterdam, Netherlands

                 October 13, 2025

                                                    _____

                                                        **PAUL BAVELAAR**